## Case No. 13,742.

### The TAN BARK CASE.

[Brown, Adm. 131.] [1]

District Court, E. D. Michigan. May, 1866.

AFFREIGHTMENT—RELEASE OF LIEN BY DELIVERY OF CARGO—BILL OF LADING—LIABILITY OF CARRIER FOR LOSS BY FREEZING.

1. The delivery of a cargo to the consignee without demanding freight or notifying him of the master's lien therefor, will, in the absence of special agreement or local usage to the contrary, discharge such lien.

2. The mere intention of the master to retain his lien is not sufficient as against a consignee who has bought and paid for the cargo.

3. The bill of lading, though not conclusive, is very strong evidence of the apparent condition of the cargo.

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

4. A master who lays his vessel up for the winter, with cargo on board, is bound to take precautions to prevent injury from dampness or mold, and to protect his deck load from the effects of snow and ice.

5. When, by his negligence, the cargo is exposed to injury by an excepted peril, the carrier is liable. He is bound to take such precautions as he can foresee are necessary under the circumstances of the case.

Libel for freight. The libel averred that, in December, 1864, John Becker, as master of the schooner John Thursby, received on board of the schooner, at Goderich, 112½ cords of tan bark, to be carried to Detroit; that it was then very late in the season, and cold weather coming on suddenly, the schooner was frozen in and compelled to lie up at Goderich for the winter. That in the month of April following the schooner completed her voyage, and discharged her cargo at the dock of Jewell & Sons, at Detroit, with the understanding that they had bought the same, and would pay the freight thereon. That the bark was worth between $500 and $600; that their freight was to be $3.50 per cord, and that, at the time of discharging the bark, libellants notified Jewell & Sons that they claimed a lien for freight, which they would not release without payment. That Jewell & Sons promised to pay the freight, did pay $38 to apply upon it, but refused to pay the residue, or surrender possession of the bark. The answer averred that the charter had been effected in October, and the bark sold in Detroit "to arrive" at $9.50 per cord, but that, owing to the delay of the vessel, the sale had been rescinded, and claimant had made another bargain to sell to Jewell & Sons at $6 per cord, if delivered in good order. That upon reaching Detroit it was found to be so badly injured by wet, dampness and mold, as to be nearly worthless, and that this damage had been occasioned by bad stowage and insufficient care. The agreement by Jewell & Sons to pay freight was denied, as well as notice of the master's lien for the same, and it was claimed that delivery of the cargo had discharged the lien. Upon the trial it appeared that a bill of lading had been signed by the mate, certifying the bark to be "shipped in good order and condition." There was some conflict of testimony, however, as to its actual state at the time of shipment. The weather became so cold after the bark was laden on board that the vessel was unable to proceed on her voyage, and the master left her, with instructions to strip her of her sails and rigging, and lay her up for the winter. The hatches were fastened down, but not so tightly but that water dripped into the hold; the deck load had been put on board in the usual manner, but had not been roofed or otherwise protected from the weather, so that ice had gathered thick upon deck, and a portion of the bark had to be chopped out and thrown away. In being discharged, it was found

the cargo was wet, molded, and damaged about one-half its value. There was a preponderance of evidence to the effect that the master had delivered the cargo to Jewell & Sons, who were assignees of the bill of lading, without notice of his lien for freight. While the bark was being unloaded, the master went to Cleveland upon other business, returned two days after the vessel had finished discharging, and demanded his freight, which was refused.

W. A. Moore, for libellant.

The delivery of the cargo was not made with the intention of releasing the lien. Ang. Carr. § 370; The Volunteer [Case No. 16,-991]; Certain Logs of Mahogany [Id. 2,559]; The Kimball, 3 Wall. [70 U. S.] 37; 151 Tons of Coal [Case No. 10,520].

The vessel is not responsible for the damage to the bark by freezing. Clark v. Barnwell, 12 How. [53 U. S.] 272; Lamb v. Parkman [Case No. 8,020]; Baxter v. Leland [Id. 1,124].

The bill of lading is not conclusive evidence of the condition of the cargo at the time of shipment. Bissell v. Price, 16 Ill. 408; Ellis v. Willard, 5 Seld. [9 N. Y.] 529.

J. S. Newberry, for claimant.

WILKINS, District Judge. I think it established by a preponderance of testimony that the master delivered the bark to Jewell & Sons without demanding freight or notifying them of his lien. It is true that $38 was paid by them to Capt. Becker, while the cargo was being unloaded, but it was charged not to the master but to the shipper, Mr. Paul, and was allowed by him on his settlement with Jewell & Sons. The fact that the shipper was then in Detroit, and was present at the unloading of the vessel, taken in connection with the master's departure for Cleveland, and his failure to return until two days after the vessel had finished discharging, would naturally lead them to suppose he had waived his lien, and relied upon the personal responsibility of the shipper.

Prima facie, the delivery of the cargo to the consignee releases the lien for freight; it may be preserved, however, by a special agreement, by notice that the delivery is made subject to the lien, or by a local usage to that effect, but the mere intention of the master to retain his lien, not communicated to the consignee, is insufficient. Ang. Carr. §§ 370–374; Bigelow v. Heaton, 4 Denio, 496; Bags of Linseed, 1 Black [66 U. S.] 108. As Jewell & Sons bought and paid for the bark before notice of the master's lien, it would be manifestly unjust to permit him now to enforce it.

Independently of this, however, the claimant is entitled to recoup the damage suffered by the cargo. The evidence fails to satisfy me that it was not in good condition when shipped on board, notwithstanding the testimony of the master and mate that they told the shipper it was damaged and refused to receipt for it in good order. As matter of fact the mate did certify that it had been "shipped in good order and condition," and although a bill of lading may be contradicted in its recitals of number, quantity and quality, and is but slight evidence of the condition of goods packed in boxes or otherwise not open to inspection, it is very strong evidence of the outward condition of the cargo at the time of shipment.

In one case at least (Benjamin v. Sinclair, 1 Bailey, 174), it has been held conclusive evidence, though I cannot see that the doctrine of estoppel has any application to the case. It would be a premium, however, upon gross negligence to permit it to be controlled, except by clear evidence. In this case not only does the consignor testify that the bark was in good order when shipped, but it is admitted that the top layers of the deck load, which would naturally have come from the bottom of the pile as it lay upon the bank, and consequently most exposed to moisture, were in perfectly good condition when delivered.

Although a loss by freezing is an excepted peril, the carrier must be free from negligence. It was a contingency which, in this case, must have been foreseen, and should have been provided against. There is no evidence, however, that any precautions were taken to preserve the cargo from the effects of frost. Immediately upon the harbor being closed, the master left for home, leaving the vessel in charge of two men, with instructions to strip her and lay her up for the winter. He put no shipkeeper on board, but, as he says, paid a man $5 "to keep an eye on her" during the winter. There is no evidence of what was done after his departure. No precautions, however, appear to have been taken to ventilate the hold, or to prevent dampness from collecting and injuring the bark. Where a cargo gathers moisture, as sometimes occurs in passing from a warm to a cold climate, it has been held the carrier is not responsible; but where the gathering of dampness and mold is the usual effect of laying a vessel up for several months, I think the master is bound to use some precautions by ventilating his hold, or otherwise to obviate injury. At least he should have exercised the ordinary prudence of roofing over his deck load, and preventing the ice from gathering upon the deck.

Where the negligence of the carrier exposes the goods to injury by an excepted peril, the authorities are uniform that he must respond in damages. He is bound to take not merely the usual precautions against frost, but all such as he could foresee were necessary to be taken under all the circumstances of the case. Edw. Bailm. 456–478; Ang. Carr. §§ 160–164; Abb. Shipp. p. 485; Semler v. Commissioners, 1 Hilt. 244; Bow-

man v. Teall, 23 Wend. 306; Clark v. Barnwell, 12 How. [53 U. S.] 272; New Jersey Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 385.

As the damage to the cargo in this case exceeds the freight, the libellant is not entitled to recover. Libel dismissed.

NOTE. Upon the question of release of lien, see also the following cases: The Eddy, 5 Wall. [72 U. S.] 481; The Bird of Paradise, Id. 545; Tamvaco v. Simpson, L. R. 1 C. P. 363; Paynter v. James, L. R. 2 C. P. 348; Kirchner v. Venus, 12 Moore, P. C. 361.